DEMOCRATIC-FARMER-LABOR STATE CENTRAL COM-
MITTEE AND OTHERS v. MIKE HOLM.
ELMER A. BENSON AND OTHERS, INTERVENERS.[1]

September 2, 1948.

No. 34,815.

[1]Reported in 33 N. W. (2d) 831.

*Lee Loevinger,* for petitioners.

*J. A. A. Burnquist,* Attorney General, and *Ralph A. Stone,* Assistant Attorney General, for Mike Holm, respondent.

*Francis M. Smith,* intervener, *pro se.*

*Hyman H. Cohen,* for interveners Elmer A. Benson, Frank Boyd, Walter Johnson, Joseph Paszak, Orville E. Olson, George Vikingstad, Ione Kleven, Axel T. Nyberg, James Youngdale, and Carolyn Storlie.

LORING, CHIEF JUSTICE.

This is a proceeding in this court under M. S. A. 205.78 initiated by petition by those purporting to be the chairman and the secretary of the state central committee of the Democratic-Farmer-Labor party, which, for the sake of convenience, will hereinafter be referred to as the DFL party, seeking an order or writ requiring the secretary of state to correct a claimed error or omission in the

preparation of ballots for the general election to be held November 2, 1948, insofar as those ballots contain the names of presidential electors nominated by the convention of that party. There is no contention that the petitioners are not qualified to bring the proceeding. See, State ex rel. Sauer v. District Court, 74 Minn. 177, 77 N. W. 28. The question of whether electors may be nominated by petition is not before us.

It appears by the petition that the secretary of state has refused to accept the petitioners' certificate as to nominees for presidential electors for the reason that another certificate, fair on its face, also purporting to name presidential electors for that party, had previously been filed in his office on June 14, 1948.

The petition seeks an order requiring the secretary of state to reject the certificate previously filed and to receive and file a certificate naming the nominees for electors of the DFL party which the petitioners propose to file. Following the filing of the petition in this court, the persons who filed the first certificate, who are interveners herein, moved this court for an order discharging the petition, and, in the event the petition be not discharged, they filed an answer and asked for the appointment of a referee to take testimony on issues of fact which they contend are tendered thereby.

The facts out of which the present controversy arose are that the 1948 convention of the DFL party was legally called by the state chairman to convene in the armory at Brainerd, Minnesota, on June 12 and 13, 1948. The delegates to that convention assembled and organized the convention. The answer to the petition admits the legality of the call and that the convention was organized and proceeded to pass upon contested delegations, but in connection with such contests alleges that those delegates who voted in the convention "arbitrarily, capriciously, oppressively and unlawfully" excluded legally elected delegates who were under contest. As examples of such alleged "arbitrary, capricious, oppressive and unlawful" actions, the answer alleges some eleven examples of conduct, all of which relate in some manner to such contests. The answer then charges that by such actions the theretofore legal con-

vention ceased to be the legal convention of the party, and early in the afternoon of June 13 became a mere assemblage of citizens without authority to bind the party, whereupon certain delegates withdrew from the convention and met immediately in front of the armory, where the convention was being held, assumed to organize themselves into a convention under the original call, and adjourned to a hall in the city of Minneapolis to reassemble at 10 p. m. of that same day. It was at this reassembly in Minneapolis that the persons whose names appear on the certificate, first filed with the secretary of state, were nominated as electors, and it was by a certificate filed by the alleged officers of that assumed convention that the certificate of nominations was filed with the secretary of state on June 14, 1948.

It is the contention of the petitioners that the Brainerd convention was the duly called and organized party convention and that it had the sole right to judge the qualifications and credentials of its own members; that its determinations thereof are not subject to judicial review; and therefore that the certificate already filed with the secretary of state is not the certificate of the duly authorized party or of its convention officers. On the other hand, the interveners, who are the officers of the Minneapolis convention, contend that the actions of the Brainerd convention with reference to the seating of contestants was so arbitrary, fraudulent, and unlawful as to justify the withdrawal of the delegates and the organization of a new convention under the original call which would have the authority to nominate electors.

■ The rule with regard to judicial review of the actions of political conventions is that in factional controversies within a political party, where there is involved no controlling statute or clear right based on statute law, the courts will not assume jurisdiction, but will leave the matter for determination within the party organization.

■ Absent a controlling statute, a political convention is the judge of the election, qualifications, and returns of its own members. Such a convention is not a select body requiring the presence of a majority of all persons entitled to participate in order to con-

stitute a quorum for the transaction of business. If that convention is regularly called, those who actually assemble constitute a quorum, and a majority of those voting is competent to transact business. The withdrawal of either a majority or minority does not affect the right of those remaining to proceed with the business of the convention, and those withdrawing cannot claim to be the legal party convention.

This court in Phillips v. Gallagher, 73 Minn. 528, 534, 76 N. W. 285, 287, 42 L. R. A. 222, in discussing a contention that the law relative to election contests applied to party convention nominations, said:

"But such rules have only a limited application to a political convention, which has control over its own proceedings and officers, in the absence of any statutory regulations, and may proceed according to party usages and customs. The questions which such a convention deals with are essentially political, and it would be a menace to the right of the members of a political party to select their own party nominees, and to the respect which should be entertained for judicial tribunals, for the courts to review and reverse the proceedings of a political convention, in the absence of fraud or oppression on its part or of its officers.

"The delegates in a nominating convention meet for the purpose of selecting and agreeing upon candidates for office, to be supported by the party. The discharge of this duty involves the exercise of judgment and discretion on the part of the members of the convention, and a majority of them have, in the absence of fraud or oppression, the right to control the action of the convention, and to correct or reverse any action taken by it. Such a convention is a deliberative body, and unless it acts arbitrarily, oppressively or fraudulently, its final determination as to candidates, or any other question of which it has jurisdiction, will be followed by the courts. See State [ex rel. Childs] v. Kiichli, 53 Minn. 147, 154, 54 N. W. 1069, 1070, 19 L. R. A. 779; Manston v. McIntosh, 58 Minn. 525, 528, 60 N. W. 672, 673, 28 L. R. A. 605; In re Fairchild, 151 N. Y. 359, 45 N. E. 943. Any other rule would be intolerable, and permit the courts to

impose upon a party a nominee contrary to the wishes of its members, as finally expressed by their representatives in convention."

The "fraud or oppression" referred to is, in our opinion, only such perversion of the purposes of the convention as may be effected after those purposes have been finally determined. It does not include the action of the convention in seating delegates involved in contests, because such a convention is the judge of the qualifications and right to seats of its own members. These qualifications and rights are political, as distinguished from legal rights, unless based upon specific statute; and courts will not entertain jurisdiction of them. See, Annotations, 20 A. L. R. 1035 and 169 A. L. R. 1282.

The answer in this case sets up only conclusory words alleging fraud and oppression, without supporting facts as to the illegality of the delegates seated. If, upon such an allegation, we were given jurisdiction to inquire as to the regularity of the elections of delegates to the state convention, we, instead of the state political organization, would be confronted with the political task of organizing the convention. Marcum v. Ballot Commrs. 42 W. Va. 263, 26 S. E. 281, 36 L. R. A. 296. In that case, in discussing the powers of a circuit nominating convention and the limits of judicial review, the court said (42 W. Va. 272, 26 S. E. 284):

"* * * *That convention,* like the two branches of the state legislature and congress, *like all deliberative bodies having power to organize, is the judge of the election, qualification, and returns of its own members.* If we go back of the circuit convention, how far shall we go? What shall limit our inquiry? Must we overlook every convention or primary election to say whether its members were old enough or of the politics to entitle them to participate? *There must be a limit of reason to our powers. That is the convention whose nominations are in question before us.* To hold otherwise would be for this Court to assume power to supervise and review the organization of political conventions—practically to organize them." (Italics supplied.)

The case of State ex rel. Fosser v. Lavik, 9 N. D. 461, 83 N. W. 914, is on all fours with the case at bar, although it involved a county convention instead of a state convention. In that case, as here, two certificates of nomination were presented to the county auditor, and he refused the second one. The court said (9 N. D. 462, 83 N. W. 915):

"* * * It is clear that the one duty of the court in this case is to determine which faction, if either, constituted the *de facto* Republican convention. It is not our province to correct parliamentary errors, or to scrutinize the parliamentary methods by which an organization of a convention was secured, if only an organization of the Republican county convention was effected. A mass of affidavits has been presented to us, but we accept the statement of facts as found in defendant's brief, adding thereto only matters that are undisputed. The call for the convention was regular in all respects, and fixed the total number of delegates from the county at 19. The caucuses were duly held, and delegates properly elected from all the precincts except one. In that precinct one Dolan was elected, not by ballot, as required by section 497a, Rev. Codes, but by a *viva voce* vote of the electors present. On the day appointed for the convention the county Republican central committee met, in pursuance of usage, to determine what delegates were entitled to' participate in the preliminary organization. That committee rejected Dolan's credential,—*whether rightly or not, we must not inquire.* The delegates were called to order by the chairman of the central committee, and, on the nomination for temporary chairman, there was a tie vote of 9 to 9. The chairman of the central committee assumed the right to decide the tie,—*whether rightly or not, we need not say,* because the election of the temporary chairman was immediately acquiesced in by the entire convention. A temporary secretary was then nominated and elected by the unanimous vote of all the delegates. *It is clear at this point that a temporary organization of the convention had been effected.* The assembly was no longer an unorganized body of delegates. It was a convention. Whatever business that convention might transact must be transacted through the instrumentality

of the organization thus effected, or of some organization that might by a vote of the convention as thus organized be substituted for the then existing organization. The convention, acting upon these self-evident propositions, at once proceeded with the appointment of the usual committees for such occasions. There was no contest, except as to the committee on credentials. Upon the motion that the chair appoint such committee, the vote stood 9 to 9; and the chair, after having voted as a delegate, assumed the right, as chairman, to vote again, and decide the vote in favor of the motion. We need not waste a moment in condemning this course. *This court is not interested in determining whether or not that convention was conducted according to strict parliamentary rules and usages. Such questions are foreign to the powers of judicial tribunals.* They are *political,* purely. We are interested only in determining whether or not such convention was the Republican county convention, and as to that there can be no doubt, upon conceded facts. The committee on credentials presented a report rejecting the credentials of Mr. Dolan, who had already been rejected by the central committee, and also rejecting the credentials of one McDonough. The motion to adopt this report was carried by a vote of 9 in the affirmative to 8 in the negative; the chair refusing to count the vote of McDonough in the negative. *That convention was the exclusive judge of the qualifications of its own members,* and by that vote it conclusively determined that there were 17 qualified delegates elected to that convention, and no more, and that Dolan and McDonough were not delegates legally elected and qualified to sit in said convention. When this was definitely determined, the 8 delegates, who were thus left a minority faction, and all of whom had participated in the preliminary organization and in every move of the convention up to this point, without any motion to adjourn, or any public announcement of any intention to withdraw, quietly left the room, and, calling to them the 2 men who had been rejected by the convention, they proceeded to another room, and assumed to organize themselves into a convention, and nominated a full list of county officers; and the parties who acted as chairman and secretary of such assumed convention

executed a certificate of nomination, fair on its face, and purporting to be the nominations made by the Republican county convention for the offices therein specified. The certificate was received and filed by the auditor. The 9 delegates remaining in the regular convention, and being a majority of the delegates entitled to seats in that convention, proceeded to nominate county officers; and a certificate of such nomination, fair on its face, and purporting to be the certificate of nominations made by the Republican county convention for said Pierce county, was presented to the auditor, who refused to receive or file the same, for the reason that the certificate of nominations made by the Republican county convention was already on file in his office. True it is that the auditor could properly receive and place upon the official ballot but one list of Republican nominations for county offices, *but he was bound to so receive and place upon the ballot the nominations made by the regular Republican county convention.* State v. Falley, 9 N. D. 450, 83 N. W. Rep. 860. This he has refused to do. Let the peremptory writ issue as prayed. All concur." (Italics supplied.)

We regard the reasoning of that case as sound.

In the later case of State ex rel. Granvold v. Porter, 11 N. D. 309, 319, 91 N. W. 944, 950, involving a similar situation, the court said:

"* * * The convention was not a select body, requiring the presence of a majority of all the persons entitled to participate in order to constitute a quorum for the transaction of business. The common-law rule as to assemblages of this character is that, where the meeting is regularly called, those who actually assemble constitute a quorum, and a majority of those voting is competent to transact business. Those who do not attend are presumed to assent to the action of the majority of those who do attend and vote. Field v. Field, 9 Wend. 395; Craig v. Presbyterian Church, 88 Pa. 42, 32 Am. Rep. 417; Ex parte Willcocks, 7 Cow. 401, 17 Am. Dec. 525; Everett v. Smith, 22 Minn. 53; Smith v. Proctor, 130 N. Y. 319, 29 N. E. Rep. 312, 14 L. R. A. 403; Lawrence v. Ingersoll, (Tenn.) 6 L. R. A. 308, and note (s. c. [88 Tenn. 52] 12 S. W. Rep. 422, 17 Am. St. Rep. 870) ; Cass County v. Johnston, 95 U. S. 360, 24 L. Ed. 416.

It follows, therefore, that, by withdrawing, the delegates merely waived their right to participate in the convention, and that their action in so doing did not affect its identity, or deprive those who were present of the right to proceed with the business of the convention. This we understand to be true in all cases, whether the withdrawing members constitute a majority or a minority. In this case the fact is established, however, that a majority of lawful delegates was present at all times in the Fox convention, and participated in its action. The convention which nominated the relator consisted of six regular delegates,—the relator, who held a proxy, and Stevens, whose right to participate had been rejected by the regular convention. These facts bring the case fairly under the decision of this court in State [ex rel. Fosser] v. Lavik [9 N. D. 461, 83 N. W. 914], supra, wherein we held *that a minority of the delegates to a political convention cannot withdraw therefrom, and join themselves with those whose credentials have been rejected, and successfully claim that they constitute the legal party convention.*" (Italics supplied.)

In the article on Elections appearing in 18 Am. Jur., §§ 136, 137, the rule governing the powers of political conventions and the judicial review of their actions is stated as follows:

"A convention has the inherent power incident to all deliberative bodies having the power to organize to judge of the election, qualifications, and returns of its own members, and its action in seating or rejecting delegates is not subject to judicial review. * * * The convention, when assembled and organized, is, as has previously been shown, the depository of all party power, and it cannot be bound or limited in its action in any way by the permanent committee in the call issued for the convention. In the absence of statutory regulations, it has control over its own proceedings and affairs and may proceed according to party usages and customs. The discharge of the duties imposed on the convention involves the exercise of judgment and discretion on the part of its members, and a majority of them have, in the absence of fraud or oppression, the right to control

the action of the convention and to correct or reverse any action taken by it, and its final determination as to candidates or any other question within its jurisdiction will be followed by the courts. * * *

"A convention regularly called and organized is not dissolved by the withdrawal of a minority of the delegates present, but remains, as before, a convention with full power to nominate the candidates to be voted for. Its nominees, and not those of the withdrawing minority, are entitled to be placed upon the ballot, * * *."

In 29 C. J. S., § 88, of article on Elections, the rule is stated as follows:

"Except to the extent that jurisdiction is conferred by statute or that the subject has been regulated by statute, the courts have no power to interfere with the judgments of the constituted authorities of established political parties in matters involving party government and discipline, *to determine disputes* within a political party as to the regularity of the election of its executive officers, or their removal, or to determine contests for the position of party committeemen *or convention delegates.* As elections belong to the political branch of the government, the courts will not be astute in seeking to find ground for interference, but will seek rather to maintain the integrity and independence of the several departments of the government by leaving questions as to party policy, the regularity of conventions, the nomination of candidates, and the constitution, powers, and proceedings of committees, to be determined by the tribunals of the party. Accordingly the courts will not assume jurisdiction of cases involving inquiry into the conventions of a political party. Thus the action of a state convention in deciding between two contesting delegations and the regularity of the state or district conventions or other meeting at which they were selected is regarded as conclusive." (Italics supplied.)

M. S. A. 204.02 provides:

"Presidential electors for the several political parties of this state *shall* hereafter *be nominated by delegate conventions called and held*

*under the supervision of the respective state central committees of the several parties of this state.* The *names* of the persons nominated as presidential electors shall be *certified to the secretary of state by the chairman of such convention* for the office of presidential elector and shall be placed upon the general election ballot in the manner now provided by law." (Italics supplied.)

The provisions which now appear as M. S. A. 204.02 first appeared as Ex. Sess. L. 1919, c. 27, later appearing as L. 1923, c. 125, § 11. Theretofore the nomination of electors had been subject to the provisions of the direct primary law. There was also at one time a presidential preference primary, L. 1913, c. 449, later amended by L. 1915, c. 372, but repealed by L. 1917, c. 133. After its repeal and the extension of the primary to all other state officers,[2] the elaborate machinery of the primary law, no doubt, seemed to the legislature wholly unnecessary, as applied to presidential electors, who by party organization, usage, and custom were bound to vote for the candidates nominated by the national convention. Consequently, Ex. Sess. L. 1919, c. 27, was enacted in time to apply to the 1920 presidential election. As we construe c. 27 and its continuance in force as a separate section in all subsequent legislation, as in L. 1923, c. 125, § 11, it was clearly intended to lift the convention to nominate presidential electors out of the other provisions of the primary election law and place it in a separate class under the control of the state central committee. The language of c. 27, now appearing as M. S. A. 204.02, is inconsistent with any other intent. We do not regard M. S. A. 202.11, *et seq.*, as controlling this convention. Certainly, there is no intent evinced in those sections to confer jurisdiction on this court in controversies of this character. In Johnson v. Schmahl, 119 Minn. 179, 137 N. W. 741, this court held that the primary election law repealed, as inconsistent with its terms, the law providing for nomination of state officers by conventions. We think it is just as clear that as to presidential electors, whose situation is unique and distinct from that of other officers, the legisla-

---

[2] As originally enacted, the primary did not extend to state officers. L. 1899, c. 349.

64

tive intent was to restore the convention completely to party control. We so construe the section. Nothing in it indicates an intention to vest in the courts jurisdiction to pass upon the committee's decisions or on those of the convention so called, held, and supervised. The customs and usages of the party or its constitution were obviously sufficient protection to its members. No party constitution could confer jurisdiction upon the courts, and the statute authorizing such constitutions does not. M. S. A. 202.10.

 We conclude that the courts have no jurisdiction of the issues attempted to be raised by the pleadings before us and that consequently there is no issue of fact upon which a reference should be ordered. We further conclude that the electors nominated by the regular convention at Brainerd are entitled to be placed upon the ballot; that those named on the certificate, filed June 14, 1948, have no such right; that that certificate should be rejected and purged from the files of the secretary of state and that of the petitioners received and filed when the same is in due form. Let a mandate to that effect issue to the secretary of state.

So ordered.

MR. JUSTICES PETERSON, THOMAS GALLAGHER, and FRANK T. GALLAGHER took no part in this decision.